# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs April 23, 2013

## TAFT ARKEY MURPHY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2004-B-1260     Monte Watkins, Judge**

---

**No. M2011-00555-CCA-R3-PC - Filed September 19, 2013**

---

Petitioner, Taft Arkey Murphy, appeals from the post-conviction court's denial of his petition for post-conviction relief following an evidentiary hearing. Petitioner was convicted of possession with intent to sell three hundred or more grams of cocaine in a school zone, possession with intent to sell twenty-six or more grams of cocaine in a school zone, the sale of twenty-six or more grams of cocaine in a school zone, two counts of the sale of twenty-six or more grams of cocaine, and possession of a handgun by a felon. He received an effective eighteen-year sentence in the Department of Correction. On appeal, Petitioner contends that the post-conviction court erred in denying the petition because trial counsel rendered ineffective assistance of counsel. Specifically, Petitioner contends that trial counsel was ineffective (1) by failing to adequately communicate and meet with him to prepare for the case and failing to properly investigate the facts of the case; (2) by failing to discuss with Petitioner whether he should testify on his own behalf at trial; and (3) by failing to object to testimony regarding Petitioner's prior voluntary manslaughter conviction. Following our review of the record, we affirm the denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J. and NORMA MCGEE OGLE, J., joined.

Ashley Preston, Nashville, Tennessee, for the appellant, Taft Arkey Murphy.

Robert E. Cooper, Jr., Attorney General and Reporter; Michelle Consiglio-Young, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Roger Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Background

The relevant facts underlying Petitioner's conviction as recited by this court on direct appeal are as follows, and Petitioner is referred to as "the defendant:"

The evidence showed that a confidential informant arranged four drug sales with the defendant. The first three sales occurred on January 30, February 10, and February 19, 2004, under police surveillance. The record reveals that on January 30, 2004, the defendant sold the confidential informant two ounces of crack cocaine for $1500. The confidential informant again purchased two ounces of crack cocaine for $1500 from the defendant on February 10, 2004. On February 19, 2004, the confidential informant bought two ounces of crack cocaine from the defendant in a school zone for $1500. Following these three sales, the police obtained a search warrant for the defendant's home and an arrest warrant for the defendant. The fourth sale did not occur, as the police arrested the defendant upon his arrival. This occurred within 1000 feet of a school. When arrested, the defendant had bags of crack and powder cocaine, digital scales, and $187 secreted on him.

The state's confidential informant, Anthony Cruz, testified against the defendant regarding the drug charges. Cruz stated he had worked with the state to set up drug sales with the defendant. He acknowledged that he had a prior criminal record and that he had been on probation in both federal and state court when he violated his probation. He said he had admitted in court that he had violated his probation. He stated his attorney and state and federal prosecutors had negotiated an agreement that he would cooperate with both sets of authorities in exchange for being allowed to remain on probation. He explained why he identified the defendant as a drug dealer to the authorities and how he arranged the four drug sales with the defendant.

Metropolitan Nashville Police Detective Joe Simonik testified that officers obtained a search warrant and searched 2101 Porter Road, where the defendant lived with his mother in one of her homes. Detective Simonik said that he and other law enforcement officers had seen the defendant leave the house and return to it on prior occasions. He stated that while executing the search warrant, he had advised the defendant's mother of her rights and that she said the defendant was her son. He stated that she said only she and her son lived at the house. He said she identified the car parked behind the house as the

-2-

defendant's. He stated the defendant's mother also told officers which room was her son's.

Detective Simonik stated that officers found hidden trash bags "stuff [ed]" with money in various denominations in a closet in the defendant's room. Detective Simonik stated that a .25 caliber handgun loaded with five bullets was found in the closet near these trash bags. He said that officers found two other handguns, a .44 caliber pistol and a .32 caliber revolver, hidden under the defendant's dresser in the defendant's room. Detective Simonik said the .44 pistol had been reported as stolen. Detective Simonik said officers moved the dresser to photograph the guns. Detective Simonik stated that three long-barreled guns were found in the living room area downstairs. He said one gun found in the mother's room had been reported as stolen, as well.

Detective Simonik testified that officers found clothing they considered to be in the defendant's sizes in the defendant's room. He said they also found some of the defendant's "paperwork," including a bank card, bank statements, and bills with the defendant's name on them. Detective Simonik stated that another document found in the defendant's room was a rent notice to the defendant from his mother.

Detective Simonik testified the defendant's mother told the officers that the guns in the defendant's room were not hers. He said that officers had arrested the defendant and transported him to 2101 Porter Road. The detective said the defendant was there during the time of the search. He said the defendant's mother was able to see that the defendant was in the house.

The charge of unlawful possession of a handgun by a convicted felon was submitted to the jury as a bifurcated proceeding. The jury determined whether the defendant knowingly or recklessly possessed a handgun at 2101 Porter Road and whether he was a convicted felon knowingly or recklessly in possession of a handgun. The record includes each of the two indictments for count three. After finding that the defendant possessed a handgun, the jury then heard the testimony of Lisa Odle, the docket clerk for the Nashville Criminal Court, Division Five. She stated that the name, gender, race, date of birth, and social security number of the defendant matched those in a November 13, 1997 judgment convicting the defendant of voluntary manslaughter, a felony.

*State v. Taft Arkey Murphy*, No.M2007-00403-CCA-R3-CD, 2008 WL 4735494, at *1-2 (Tenn. Crim. App. Oct. 27, 2008).

*Post-Conviction Hearing*

Petitioner testified that he was initially represented by another attorney, and his case was continued several times. That attorney had to withdraw as counsel due to a conflict of interest. The trial court appointed trial counsel to represent him, and he was found guilty at trial and received an eighteen-year sentence. There were seventeen co-defendants in his case.

Petitioner testified that he was incarcerated when trial counsel was appointed, and he made bond at some point in order to assist trial counsel in preparing for the case. While he was still in custody, he had met with trial counsel at the jail and on court dates. After he made bond, Petitioner went to trial counsel's office, and they reviewed discovery, which trial counsel had received from Petitioner's previous counsel. However, Petitioner claimed that he did not receive all of his discovery. He said, "Like, I didn't have everything, but I had a majority of it." Petitioner testified that he and trial counsel met for approximately one hour in his office. He explained that he was on house arrest at the time and was only allowed to be out for an hour. Petitioner testified that he and trial counsel were not able to review all of the discovery materials during the meeting.

Petitioner testified that he was able to go back to trial counsel's office a second time before trial. During that meeting, he gave trial counsel the names and addresses of several potential witnesses. However, he claimed that trial counsel "wasn't able to get to it." Petitioner testified that trial counsel said that he was going to "have to get an investigator." At that point, a trial date had been set. Petitioner testified that he was called to court and advised that his trial would be at an earlier date. He said that trial counsel then advised the trial judge that "he was filling out a motion for an investigator for an extension on the trial because he didn't have - -you know, he wasn't able to investigate the situation." Petitioner testified that trial counsel did not ask the court for a continuance. Petitioner said, "The day when he tried to ask the Judge, the Judge told him, you know, trial is set on such and such date, try to get it ready. He said, 'I'll try to get it ready.' That was it." Petitioner testified that he and trial counsel did not have any further conversation about a continuance or the use of an investigator.

Petitioner testified that trial counsel indicated that he would "try to get the paperwork" and talk to the witnesses himself; however, he was unable to do so. He admitted that trial counsel was attempting to get in touch with the witnesses in the couple of weeks before trial. Petitioner testified that he and trial counsel discussed strategy, which consisted of trial counsel contacting the witnesses and checking the phone numbers. He said, "And that was

part of the strategy, that we never, you know, got the information. And this - - my hearing that I had with [previous counsel] to get that paperwork and all this that was part of the strategy."

Petitioner believed that being unable to get all of the information prejudiced his case.

Petitioner testified that he spoke with trial counsel the weekend before trial. When asked if he felt confident and comfortable about going to trial, Petitioner said:

Yes. I felt confident that if he would have got the information, which he already told me he would have them here and he was going to speak to the people and got them to come to trial, at least, speak with them to see if they would come to trial. I was confident, because I know what I didn't do.

Petitioner testified that on the morning of trial, he learned that trial counsel was unable to get any of the paperwork or talk with the witnesses. At that point, he did not have confidence in trial counsel's representation.

When asked if he had any further issues with trial counsel, Petitioner replied:

No, you know, because he directed me in the right area. Because he said, []If I take the stand they [sic] going to bring up my old case,[] which was a murder case. So, that there was part of our strategy. So I said, well, I don't want to take the stand in my defense, because that is one reason I couldn't get a job or nothing was because of my old murder [case]. So, he said, that's the right thing to do. But, you know, the guy, the CI, confidential informant, he brings up my old murder case in trial. And so, now, you know, he didn't get up to - - if he was going to bring my murder case up in this trial, my old murder case, I would have liked to have got up to take the stand, so I would be able to tell them, you know, the situation behind the murder case, and, then, let me take the stand on this other case - - this other case.

Petitioner testified that trial counsel did not object when the confidential informant (CI) brought up his murder case at trial. He said that there was an agreement between trial counsel and the assistant district attorney general that the CI would not mention the murder during his testimony.

On cross-examination, Petitioner testified that if his case were retried, his defense would be that his car had been stolen and that he "didn't do the sale with the confidential informant." He denied that this defense was used during his trial. Petitioner claimed that

-5-

trial counsel should have gone to the water department and obtained a statement to prove that no one could live in his room at his mother's house. He acknowledged that police found his clothes and items bearing his name in the room, and his mother told police that it was his room.

Petitioner testified that the trial court asked if he wanted to testify at trial. The trial court also reviewed his right to testify, and Petitioner indicated that he understood that right. Petitioner testified that trial counsel informed him that he had no option but to go to trial because the State's offer was to serve his sentence at one-hundred percent. He claimed that all of his co-defendants had offers to serve their sentences at thirty-percent. Petitioner testified that he did not know the names of any witnesses that trial counsel failed to interview and call at trial. He said, "I never met them before. That's why I asked [trial counsel] to go and speak with these people."

Trial counsel testified that he was appointed to represent Petitioner and that he received discovery materials from Petitioner's previous attorney. He obtained additional information from the State that consisted of "tapes, audio tapes of the meetings between [Petitioner] and the confidential informant." He also received "copies of photographs that were taken at [Petitioner's] residence when this search warrant was executed, after he was taken down at Hunter's Automotive." Trial counsel testified that approximately ten days before trial, he received information concerning the CI that contained "the arrangement; his prior criminal record; his name; and what he was being paid, if anything." Trial counsel testified that he questioned the CI at trial about his criminal background and the reason why he chose to become a confidential informant and why he chose Petitioner "as the person he decided to inform on." Trial counsel testified that the CI was not present during the search of Petitioner's residence. He saw no indication that anyone lived in the residence other than Petitioner.

Trial counsel testified that Petitioner told him that he had an alibi, but trial counsel never received any evidence to support the claim. Trial counsel noted that he was appointed to represent Petitioner on February 15, 2006, and he briefly consulted with Petitioner. A status hearing was held on February 17, 2006, and the trial was then set for August 28, 2006. Trial counsel testified that he met with Petitioner on August 22, 2006, for approximately two hours, and they discussed the case. It was at that time that Petitioner indicated that he had an alibi. A status conference was held on August 23, 2006, and trial counsel requested a continuance based on what Petitioner had told him. The trial court denied the request.

When asked if he had sufficient knowledge of the State's evidence, trial counsel replied:

Well, I clearly did. I felt that I had enough knowledge about what the State was going to present. I felt it was a difficult case because of the state of the evidence that the State had, the weight of the evidence that the State had. The confidential informant was prepared to testify that on three separate occasions he had sold to [Petitioner] - - he had purchased from [Petitioner], more than a half ounce of cocaine, and that he arranged for a fourth transaction at Hunter's Automotive, which he did not go to, but that [Petitioner] attended, and that was when he was taken down.

I was, basically aware that [Petitioner] had been followed, from the first transaction on, by members of the Twentieth Judicial Drug Task Force, Detective Kajihara and others, and that they had, in fact, even gone to his house and at different points looked in his trash can and found the wrappers of what they believed to be drug wrappers, cocaine wrappers, and so on.

So, I was aware of the fact that they had substantial surveillance on [Petitioner] throughout all of the transactions, and that they had - - when they had gone to his house they had secured, I believe, it was two hundred and fifty thousand dollars in cash, six kilos of cocaine, and several weapons.

Trial counsel testified that this made Petitioner's alibi defense less realistic. However, trial counsel testified that he advanced the alibi argument during opening statements as Petitioner requested. He said, "But I did not have the foundation that I needed to really see it all the way through."

Trial counsel testified that he had difficulty contacting individuals that Petitioner wanted him to contact because he was in the middle of trial. He said, "that was [the] reason why I asked for the continuance on it in the first instance." Concerning the potential witnesses, trial counsel testified:

During the course of the trial it became clear to me that some of the - - I knew that one of the individuals he wanted me to contact would have been inherently questionable because that was actually, I think, his baby's mother. And she was - - she would have been the only witness, and she was his baby's mama. So, you know, I felt like that might not sway the jury. And the other individual was, actually, sort of a street figure of sorts. And I was advised by General Zimmerman that all these individuals had some records that would make their credibility extremely questionable. Not having the information exactly that, you know - - I was unable to get them anyway, so I had to proceed without

-7-

them. And in my closing argument I decided to rest on what - - you know, let the State carry the burden and try to rest on it.

Trial counsel acknowledged that the CI mentioned Petitioner's manslaughter conviction during his testimony. He admitted that he was surprised by the testimony because he had previously met with the trial court and the State, and "we elected to, sort of, bifurcate the hearing and have the issue of whether or not he was a felon in possession of a handgun tried separately." Trial counsel testified that the testimony was "sort of, a breach of the agreement." He said that he did not "jump up and down because [he] was hoping that the jury might not have paid much attention to it, because it was a small statement made, more or less, in passing." Trial counsel testified that he raised the issue during the motion for new trial. He said, "And in my memorandum in support of the motion for a new trial I brought up the fact that he was unduly prejudiced by the testimony of [the CI], regarding his prior conviction for manslaughter."

On cross-examination, trial counsel testified that prior counsel had been involved in Petitioner's case for approximately two years before trial counsel was appointed. Trial counsel thought that he briefly spoke with Petitioner on the day that he was appointed to represent him. His intention was to get the information from previous counsel. Trial counsel testified that he spoke with Petitioner a "handful of times regarding the case." He said that they spoke by phone and in person when Petitioner was released on bond. Trial counsel further testified:

> It should be noted, however, that [Petitioner] had a desire to be released on bond, and - - I got the case in February, and I was going through my notes and I noticed between February when I got the case and eventually, I guess, July, although we talked some about the case, much of my efforts were spent in getting bond for [Petitioner].

Trial counsel noted several meetings with Petitioner that referenced the bond motion and possible defenses to the charges against Petitioner.

In regard to possible defenses, trial counsel testified:

> I do note that I continually - - because what I was able to gather from what the State's proof was - - I asked [Petitioner] rather regularly what defenses he thought we should use, given the fact that this individual, the confidential informant, was prepared to say "I bought it from you."

And that was - - to me those were some very difficult statements to overcome, along with the fact that there was a number of police officers who were prepared to get up on the stand and testify to the fact - - because I read the police reports. And a number of the police officers were saying, "We tailed this car from X point to Y. The confidential informant was set in place. The confidential informant met with [Petitioner], or met with the car that contained [Petitioner]. We followed the car back to X location." Sometimes back to his house, sometimes to other locations, but, you know, as you know from reading the trial transcript there were a number of times when they actually said, "Yeah, it was him. I was following him in the car the whole time."

Trial counsel testified that there was a lot of discovery materials, and he reviewed everything that he had with Petitioner. He did not believe that there was any further information that the State would have provided to him. Trial counsel testified that he had copies of all photographs, police reports, and the names of any officers that would be called to testify. He noted that during trial, one or two officers "pulled out some documents that they used and I asked for time to review those." Trial counsel testified that the State provided the name of the CI and "essentially the sum total of what his testimony was going to be about, along with the, I think, the tape [that] was involved."

Concerning witnesses, trial counsel testified:

There was a question regarding one individual, in particular, that [Petitioner] wanted to bring some question about, regarding a Mr. Chavis, who was, also, one of the co-defendants in the case. That had something to do with the automobile that [Petitioner] was driving, because Chavis had gotten some of the automobiles. And I talked to one of the officers about that, but he only - - he was only able to tell me that Chavis was only involved because of the cars, so there wasn't really anything - - I didn't know of anything other than what I already knew and what I've testified to. So there wasn't any information that I thought that I didn't have.

Trial counsel testified that the only defense provided by Petitioner was, "It wasn't me." He said that approximately four to six days before trial, Petitioner said that he was with his "baby's mama" on one of the days and with "this other guy on this other day." Trial counsel testified that Petitioner gave him "three or four different potential alibis for the actual sales." Concerning trial strategy, trial counsel testified, "So, my strategy, at that particular point, ended up being the strategy that I carried through the trial, was to let the State prove beyond a reasonable doubt that it was [Petitioner] and that it couldn't have been anybody else."

Trial counsel acknowledged that the CI mentioned Petitioner's voluntary manslaughter conviction during his testimony. He could not recall if Petitioner knew the CI, but he said that the CI stated that he knew Defendant. Trial counsel testified: "[Petitioner] continually maintained that he wasn't present during any of the sales, so, you know, it became a little hard to figure out if he knew the guy." He thought that Petitioner indicated that he knew the CI from some of his "street dealings." When asked why he did not object to the CI's testimony about Petitioner's prior conviction, trial counsel testified:

> Strategically I thought it best to draw as little attention to it as possible, since it was a brief comment that I didn't think was  - - that [sic] brought out. It became an unintentional statement by the - - it was, basically, kind of, an unintentional statement, or maybe it was an intentional statement.

> I don't know exactly what his intent was. But I do know that it was a brief statement and I didn't - - I felt strategically, rather than jump up and object and make more of it at that particular time, I raised the question in my motion for a new trial, specifically based on the prior agreement that we had with the State, that such matters wouldn't be brought before the jury.

Trial counsel testified that it did not become apparent to him that an investigator would be necessary in Petitioner's case until Petitioner advised him of a possible alibi defense on August 22, 2006. Petitioner's trial was set for August 28, 2006. It then became clear to trial counsel that if an alibi was going to be used he "would need to know a fair amount about the actual individuals who [Petitioner] was going to use, and about the circumstances surrounding it, and whether there were any other witnesses around at that particular time that [Petitioner] was alleging the alibi could be used to assist [Petitioner]." Trial counsel testified that a status conference was set for the following day, August 23, 2006, and trial counsel asked the trial court for a continuance based on the information that Petitioner had provided about an alibi. The request for a continuance was denied, and trial counsel testified that he did not request funds for an investigator at that time because he did not feel that there was enough time "to generate it and turn it around in time for it to be useful during the course of the  - - at the actual trial itself that was scheduled to begin in just a few days."

## II.  Standard of Review

On appeal, Petitioner asserts that he received ineffective assistance of trial counsel because trial counsel (1) failed to adequately communicate and meet with him to prepare for the case and failed to properly investigate the facts of the case; (2) failed to discuss with

Petitioner whether he should testify on his own behalf at trial; and (3) failed to object to testimony regarding Petitioner's prior voluntary manslaughter conviction. We disagree.

In a claim for post-conviction relief, the petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn.Code Ann. § 40-30-103. Petitioner bears the burden of proving factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); *Grindstaff v. State,* 297 S.W.3d 208, 216 (Tenn. 2009). The post-conviction court's factual findings "are conclusive on appeal unless the evidence preponderates against those findings." *Jaco v. State,* 120 S.W.3d 828, 830 (Tenn. 2003). Upon review, this court will not reweigh or reevaluate the evidence below, and all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial court, not this court. *Momon v. State,* 18 S.W.3d 152,156 (Tenn. 1999).

On appeal, the post-conviction court's findings of fact are entitled to substantial deference and are given the weight of a jury verdict. They are conclusive unless the evidence preponderates against them. *See Henley v. State,* 960 S.W.2d 572, 578 (Tenn. 1997); *Alley v. State,* 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). A post-conviction court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *Fields v. State,* 40 S.W.3d 450, 457 (Tenn. 2001). Our supreme court has "determined that the issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact, . . . thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. *State v. Burns,* 6 S.W.3d 453, 461 (Tenn.1999).

When a petitioner seeks post-conviction relief based on the alleged ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient, and (b) that the deficient performance was prejudicial. *See Powers v. State,* 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result would have been different. *See Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State,* 960 S.W.2d 572, 580 (Tenn. 1997).

-11-

On claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. *See Adkins v. State,* 911 S.W.2d 334, 347 (Tenn. 1994). This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See id.* However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State,* 847 S.W.2d 521, 528 (Tenn.Crim.App.1992).

Concerning Petitioner's post-conviction petition, the trial court made the following findings:

A close review of the record and testimony presented, reveals that the trial counsel testified he met with the defendant on several occasions and informed him of the nature of the charges against him, the likelihood of conviction and range of punishment for the forty-five (45) count indictment. Trial counsel explained that the petitioner's main expressed concern was that his plea offer was not comparable to his co-defendants. Also, trial counsel testified that he discussed with the petitioner that there was significant evidence that was not favorable to his defense. Specifically, the confidential informant had purchased from the petitioner on three previous occasions prior to the fourth arranged controlled buy which led to the arrest of the petitioner. Additionally, trial counsel stated that there were credibility issues surrounding potential witnesses [ ] which the petitioner wanted to call.

Therefore, Petitioner has failed to demonstrate by clear and convincing evidence ineffective assistance of counsel and that the plea was a violation of due process rights in violation of a constitutional right to render his conviction and sentence void or voidable under the Post-Conviction Relief Act. The Court does not find the petitioner's testimony to be credible. Accordingly, the Court finds that Petitioner has failed to show that he was prejudiced by counsel's allegedly deficient conduct. *Strickland*, 466 U.S. at 694.

Trial counsel was questioned at length about a litany of testimonial issues that occurred at trial. The petitioner also testified himself about many issues that occurred at trial. However, there was no showing, regardless of whether or not defense counsel had taken a different approach to the trial, that the result would have been different. Neither 'prong' of the Strickland test was shown by any evidence presented at the hearing in this cause.

-12-

First, Petitioner contends that trial counsel failed to adequately communicate and meet with him to prepare for the case and that trial counsel failed to properly investigate the facts of the case. Petitioner was represented by previous counsel for two years prior to trial counsel's appointment. Trial counsel testified that he was appointed to represent Petitioner on February 15, 2006, and he briefly consulted with Petitioner. He received discovery materials from previous counsel, and he obtained additional information from the State that consisted of "tapes, audio tapes of the meetings between [Petitioner] and the confidential informant." Trial counsel also received "copies of photographs that were taken at [Petitioner's] residence when this search warrant was executed, after he was taken down at Hunter's Automotive." Approximately ten days before trial, trial counsel testified that he also received information on the CI, including the arrangement, the CI's name and prior criminal record, and what the CI was being paid.

Trial counsel testified that he spoke with Petitioner a "handful of times regarding the case." They spoke by phone and when Petitioner was released on bond. Trial counsel testified that he met with Petitioner on August 22, 2006, and they discussed the case for approximately two hours. It was at that time that Petitioner indicated to trial counsel that he had an alibi defense. Trial counsel testified that after he was appointed, Petitioner wanted to be released on bond. He noted that much of his efforts between February and July of 2006, were spent on getting bond for Petitioner. Also, trial counsel never received any information to support the claim of an alibi. Trial counsel noted that he asked the trial court for a continuance to investigate the alibi claim, but the trial court denied the request.

Trial counsel had sufficient knowledge of the State's evidence, and he felt that it was a difficult case. He noted that the CI was prepared to testify that he sold cocaine to Petitioner on three separate occasions and that he arranged for a fourth transaction that Petitioner attended and was then taken into custody. Trial counsel was aware that Petitioner had been followed during each drug transaction by members of the Twentieth Judicial District Drug Task Force and other law enforcement officers. They had also gone to Petitioner's house and looked in his trash can and found what they believed to be cocaine wrappers. Trial counsel testified that officers found $250,000, six kilos of cocaine, and several weapons in Petitioner's residence. This made Petitioner's alibi defense much less realistic.

Concerning any potential alibi witnesses, trial counsel testified that one of the individuals was the mother of Petitioner's child and another individual was "sort of a street figure of sorts." Trial counsel had been advised by the prosecutor that all of the individuals had some record that "would make their credibility extremely questionable." He also noted that he had difficulty contacting the individuals.

In his testimony, Petitioner admitted that he met with trial counsel at the jail on court dates, and after he made bond, Petitioner went to trial counsel's office, and they reviewed discovery, which had been received from previous counsel. Petitioner testified that he was able to go back to trial counsel's office a second time before trial.

Petitioner has not demonstrated that trial counsel's performance in this area was deficient or how further meetings or communication with trial counsel would have helped his case. Petitioner did not present **any** of the potential alibi witnesses or other evidence at the post-conviction hearing, other than his testimony that the trial court found not credible, to support an alibi defense. "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Therefore, he also cannot demonstrate prejudice from trial counsel's performance in this area.

Next, Petitioner contends that trial counsel failed to adequately discuss with Petitioner whether he should testify on his own behalf at trial. He argues that trial counsel advised him not to testify so his prior conviction for voluntary manslaughter could not be brought up during trial. However, the conviction was mentioned by the CI during his testimony. Petitioner argues that he would have "liked to take the stand to explain the circumstances of the murder to the jury if they had knowledge of it, but trial counsel did not discuss this with him after the jury became aware of the conviction."

As pointed out by the State, the post-conviction court correctly found that trial counsel informed Petitioner of the nature of the charges against him, the likelihood of a conviction, and the large amount of evidence against Petitioner, factors which led to Petitioner's decision not to testify. During the trial, Petitioner was given the opportunity to testify. He acknowledged that the trial court asked if he wanted to testify, and the trial court reviewed his right to testify, and Petitioner indicated that he understood that right. When asked if he had any further issues with trial counsel, Petitioner told the post-conviction court that trial counsel directed him in the "right area" because the State would have brought up his "old case" if he had taken the stand. He testified that it was "part of our strategy." Therefore, it was ultimately Petitioner's decision not to testify.

Again, Petitioner has not demonstrated that trial counsel's performance in this area was deficient. Furthermore, he did not present any evidence at the post-conviction hearing as to what his testimony at trial would have been or how not testifying at trial adversely affected his case. Therefore, he cannot demonstrate prejudice from trial counsel's performance in this area.

-14-

Finally, Petitioner contends that trial counsel rendered deficient performance by failing to object to the CI's testimony concerning his prior voluntary manslaughter conviction. The record reflects that trial counsel made a strategic decision not to object to the testimony. Trial counsel testified that he was surprised by the testimony because he had previously met with the trial court and the State, and "we elected to, sort of, bifurcate the hearing and have the issue of whether or not he was a felon in possession of a handgun tried separately." Trial counsel testified that the testimony was "sort of, a breach of the agreement." He said that he did not "jump up and down because [he] was hoping that the jury might not have paid much attention to it, because it was a small statement made, more or less, in passing." Trial counsel testified that he raised the issue during the motion for new trial. He said, "And in my memorandum in support of the motion for a new trial I brought up the fact that he was unduly prejudiced by the testimony of [the CI], regarding his prior conviction for manslaughter."

We conclude that trial counsel made a sound, strategic decision not to object to the testimony in order to not draw further attention to Petitioner's murder conviction. As noted above, this Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State,* 911 S.W.2d 334, 347 (Tenn.1994). Moreover, Petitioner has not demonstrated or even argued how his case was prejudiced by trial counsel's failure to object to the testimony. The State's evidence against Petitioner was overwhelming, and he has not shown how the CI's brief mention of the prior conviction affected the outcome of the trial.

We conclude that Petitioner has failed to show by clear and convincing evidence that he received ineffective assistance of counsel at trial or that he was prejudiced by any alleged defective representation by counsel. Petitioner is not entitled to relief in this appeal. Accordingly, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE